AEROGLOBAL CAPITAL MAN-
AGEMENT, LLC., Plaintiff
Below, Appellant,

v.

CIRRUS INDUSTRIES, INC., Cirrus
Holding Company Limited, and Cres-
cent Capital Investments, Inc., Defen-
dants Below, Appellees.

No. 101/266,2004.

Supreme Court of Delaware.

Submitted: Jan. 12, 2005.

Decided: March 23, 2005.

Reargument Denied April 20, 2005.

Rick S. Miller of Ferry, Joseph & Pearce, P.A., Wilmington, DE, Timothy C. Russell (argued) and Michael C. Wagner of Spector, Gadon & Rosen, Philadelphia, PA, for Appellant.

Jessica Zeldin of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, Peter W. Carter (argued) of Dorsey & Whitney, L.L.P., Minneapolis, MN, John P. Brumbaugh (argued) and Michael R. Smith of King & Spalding, Atlanta, GA, for Appellees.

Before HOLLAND, BERGER and RIDGELY, Justices.

RIDGELY, Justice.

This case arises out of competing efforts of AeroGlobal Capital Management, LLC ("AeroGlobal") and First Islamic Investment Bank, E.C. ("FIIB"), through its agents Cirrus Holding Company Limited ("CHCL") and Crescent Capital Investments, Inc. ("Crescent"), to make substantial investments in Cirrus Industries, Inc. ("Cirrus"). AeroGlobal is the plaintiff below-appellant and cross appellee. Cirrus, CHCL and Crescent are the defendants below-appellees. FIIB is the defendant below-appellee and cross appellant.

In this opinion, we will begin by addressing FIIB's cross appeal contesting the Superior Court's jurisdiction over it. On cross appeal, FIIB argues that the Superior Court erred, as a matter of law, by denying its motion to dismiss for lack of personal jurisdiction because its activities did not bring it within the ambit of the Delaware Long Arm Statute.[1] FIIB also argues that the exercise of jurisdiction over it violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. We conclude that the Superior Court correctly applied Delaware's Long Arm Statute and we find no violation of the Due Process Clause. Accordingly, we affirm the Superior Court's decision denying FIIB's motion to dismiss for lack of personal jurisdiction.

We next will address AeroGlobal's appeal of the Superior Court's grant of summary judgment in favor of the defendants. The complaint sought compensatory and punitive damages and alleged that defendants were liable for breach of contract of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual obligations and civil conspiracy. We conclude that the Superior Court erred, as a matter of law, in granting the defendants' motion for summary judgment because a genuine issue of material fact exists as to whether the defendants waived certain contractual rights which were the basis for the grant of summary judgement. Accordingly, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

### A. The Parties

Cirrus is a privately held Delaware corporation headquartered in Duluth, Minnesota. The company is one of the world's largest manufactures of single-engine piston general aviation aircrafts. Cirrus was founded in 1984 by two brothers, Alan and Dale Klapmeier. Cirrus's Board consisted of ten members: Alan Klapmeier (President, CEO and Chairman of the Board), Dale Klapmeier (Chief Operating Officer), Larry Klapmeier (father of Alan and Dale Klapmeier), Marwan Atalla, James Brown,

1. DEL. CODE ANN. tit. 10, § 3104(c) (2005).

Dr. Dennis Elbert, Alice Hitchcock, Bill Midon, James Taylor, and William Woods.

CHCL is a Cayman Islands company formed for the express purpose of facilitating an investment in Cirrus by FIIB, an international investment bank based in Bahrain. FIIB has been represented throughout this transaction by Crescent, an United States subsidiary of FIIB that serves as an advisor to FIIB on certain private equity investments located in the United States.

AeroGlobal is a Delaware limited liability company created to facilitate an investment in Cirrus. The members of AeroGlobal are Graig Millard, GH Ventures LLC ("GH Ventures") and Boundary Waters Holding LLC ("Boundary Waters"). GH Ventures is a New York-based boutique merchant banking firm, whose principals are Christopher Moe and Ralph Isham. Boundary Waters is a vehicle through which Keith Fitzgerald does business with AeroGlobal.

## B. Cirrus's Financial Condition

Although Cirrus was a leader in its industry,[2] the company was experiencing cash flow difficulties. Cirrus's financial problems arose from its inability to meet the demand for its aircraft and to cover expenses, much of which are attributed to the significant cost of manufacturing FAA Type certified aircraft. Because of the capital-intensive nature of the industry, Cirrus was constantly engaged in fund raising activities. From approximately 1997 through 2001, Cirrus engaged several placement agents to raise capital and introduce Cirrus to potential investors. Much of Cirrus's early fund raising activities, however, proved unsuccessful. In the

early parts of 2001, Cirrus continued experiencing financial difficulties and had already suffered a multimillion dollar loss for that year.

## C. The Cirrus–Crescent Relationship

Early in 2001, Cirrus came to the attention of John Dyslin, a Crescent representative. Dyslin, interested in making an investment in Cirrus, visited Cirrus's corporate headquarters. After visiting Cirrus's operations, Dyslin concluded that Cirrus was a potential investment opportunity for FIIB. As a result, in March 2001, Dyslin began negotiating with Alan Klapmeier for a potential investment in Cirrus.

Cirrus, however, continued its search for capital notwithstanding its negotiations with Crescent. On April 19, 2001, Fitzgerald, a member of AeroGlobal via his membership in Boundary Waters, approached Millard about AeroGlobal possibly investing in Cirrus. Millard, in turn, extended a bridge loan to Cirrus on April 20, 2001, in the amount of $500,000, convertible into common stock. Millard also expressed an interest in making a larger investment in Cirrus.

## D. Crescent's Letter of Intent

On April 24, 2001, Cirrus and CHCL, on behalf of Crescent, executed a non-binding letter of intent (the "CHCL LOI") memorializing the negotiations between the two companies. CHCL agreed to invest $77.5 million in cash into Cirrus in exchange for 61% of Cirrus's outstanding shares on a fully diluted basis (i.e., $68.9 million directly to Cirrus for 54.2% of the outstanding shares and $8.6 million to Cirrus's shareholders for an additional 6.8%). If the

---

**2.** Cirrus's leadership position is evidenced by the fact that its two aircraft offerings, the SR20 and SR22, are two of only three U.S. produced single-engine piston aircraft in their class to receive a Federal Aviation Authority ("FAA") Type Certificate in the last fifteen years, and are the only new U.S. produced aircraft in their class to receive a FAA Production Certificate in the last twenty-five years.

parties did not reach an agreement by May 21, 2001, the CHCL LOI was terminable by either party. The CHCL LOI also contained both confidentiality provisions and prohibitions against Cirrus engaging in the solicitation, discussion or negotiation of competing proposals.

### E. AeroGlobal's Interest in Cirrus

On the following two days, AeroGlobal continued to pursue its interest in Cirrus. On April 25, 2001, Cirrus's Chief Financial Officer, Peter McDermott, spoke over the telephone with Fitzgerald about the terms of the CHCL LOI. Fitzgerald later received a copy of the CHCL LOI from Hitchcock, a Cirrus Board member and close friend of Fitzgerald. On April 26, 2001, both Millard and Fitzgerald visited Cirrus's headquarters and spoke with Cirrus Board members. During their visit, Millard and Fitzgerald also discussed the CHCL LOI with Cirrus's outside counsel, Jeff Henson. Shortly after visiting Cirrus's headquarters, AeroGlobal started a more aggressive campaign to structure a deal with Cirrus.

At the same time Cirrus was entertaining a possible investment by AeroGlobal, Crescent was moving forward with due diligence. During this period of time, Crescent extended a $4 million loan to Cirrus to satisfy its needs for operating capital, as well as sending a team of consultants to Cirrus to help with Cirrus's production efficiency problems.

### F. Crescent and Cirrus's Negotiations of the Stock Purchase Agreement

Negotiations between Crescent and Cirrus proceeded throughout May 2001 on the stock purchase agreement (the "CHCL SPA"). At some point during these negotiations, the terms of the CHCL LOI were restructured so that CHCL would invest

$77.5 million in cash into Cirrus in exchange for 61% of Cirrus's outstanding common stock on a fully converted and diluted basis.[3] Cirrus would then declare a $15 million dividend, payable to common stockholders except CHCL, making the effective purchase price $3.72 per share ($2.79 per share for cash contribution plus a per share dividend of $0.93).

### G. AeroGlobal's Continued Efforts to Invest in Cirrus

Throughout May 2001, AeroGlobal continued to pursue a possible deal with Cirrus. On May 16, 2001, AeroGlobal faxed a proposal to Alan Klapmeier, indicating that it would invest up to $45 million for shares of Cirrus common stock at a price of $4.25 per share in a non-change of control transaction.

Alan Klapmeier, in turn, informed Dyslin about AeroGlobal's recent proposal and provided him a copy of it. Dyslin and Crescent expressed concern that Cirrus was not honoring the confidentiality/no-shop provisions of the CHCL LOI, but the record indicates that they both did little to enforce those terms. Alan Klapmeier also expressed his concerns to Dyslin and other Crescent representatives that unless the AeroGlobal proposal was explored, Cirrus's Board might not unanimously approve the deal with Crescent, and Cirrus's shareholder might not approve the Crescent deal. However, both parties agreed that once the CHCL SPA was executed, Cirrus would have the opportunity to investigate further the AeroGlobal proposal.

### H. Execution of the CHCL SPA and Side Letter

The Cirrus Board met to consider the terms of the CHCL SPA on June 6, 2001 and June 7, 2001. On June 7, 2001, the Cirrus Board approved the transaction,

---

**3.** This restructuring resulted from the fact that certain Cirrus shareholders, who initially expressed interest in selling their shares, were no longer willing to do so.

and CHCL SPA was executed notwithstanding AeroGlobal's proposed investment. The CHCL SPA encompassed the terms of the restructured CHCL LOI. The CHCL SPA also required the Cirrus Board to perform certain tasks: (1) cause a special meeting of the shareholders to convene on or before June 26, 2001; (2) recommend approval of the Crescent transaction to the shareholders; (3) prepare proxy materials soliciting approval of the Crescent transaction; and (4) provide the required notice of the meeting to the shareholders.

· The CHCL SPA included a "no-shop" and "no-talk" provision. The "no-shop" and "no-talk" provision contained in Section 7.3.1 required that neither Cirrus nor any party working on behalf of Cirrus shall:

(a) solicit, initiate or encourage the submission of any Acquisition Proposal [which is broadly defined in the CHCL SPA] or (b) initiate or participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to encourage or facilitate any inquiries or the making of any proposal that constitutes, or could be expected to lead to, any Acquisition Proposal.

Section 7.3.1 goes on to provide for a narrowly tailored exception to the "no-talk" provision found in subsection (b) quoted above. It reads as follows:

Notwithstanding anything to the contrary contained in this Section 7.3 or in any other provision of this Agreement, the Cirrus Board, in response to a Superior Proposal (as defined in Section 7.3.2) which did not result from a breach of this Section 7.3.1, at any time prior to the date ten (10) days after the date hereof (the "Open Window"), may (x) participate in discussions or negotiations with or furnish information to any

Person (other than a Cirrus Related Person) (a *"Potential Acquiror"*) which makes a Superior Proposal that is submitted to Cirrus by such Potential Acquiror after the date hereof and (y) approve or recommend such Superior Proposal to the Cirrus Stockholders if, prior to any such action, the Cirrus Board determines in good faith, after consultation with Cirrus' outside financial and legal advisors, that to do otherwise would violate the fiduciary duties of the Cirrus Board and not be in the best interests of the Cirrus Stockholders.

Under section 7.3.2, the term "Superior Proposal" is defined as "any bona fide Acquisition Proposal which is reasonably likely to result in terms and consideration which are, viewed in the aggregate, more favorable to Cirrus and the Cirrus shareholders than [Crescent's proposal], considering all relevant factors. . . ." Under Section 7.3.1, Cirrus also was to notify Crescent if it received any Acquisition Proposal (or any inquiry which could lead to one) and of any Board meeting to consider an Acquisition Proposal.

To address Cirrus's need to explore AeroGlobal's proposal, the parties also entered into a Side Letter on June 7, 2001. The Side Letter provided that Cirrus and its Board were entitled "to communicate with [AeroGlobal] regarding its proposal dated May 16, 2001 . . . through June 14, 2001 without such communication being deemed to be a violation of Section 7.3 of the [CHCL SPA]." The Cirrus parties, however, uniformly believed that there was a ten-day Open Window for them to explore the AeroGlobal proposal. It was their understanding that the Open Window would run through June 17, 2001.

## I. Cirrus and AeroGlobal's Negotiations

During the Open Window period, Cirrus began to negotiate with AeroGlobal re-

garding its proposed investment. On June 14, 2001, Aeroglobal submitted a written proposal to Cirrus. The draft proposal was essentially the same as the final transaction ultimately entered into by Aeroglobal and Cirrus. The draft proposal called for a two-stage investment by AeroGlobal. First, AeroGlobal was to provide an immediate bridge loan to Cirrus in the amount of $15 million, for which warrants convertible to stock would be issued to Aeroglobal at a price no lower than $4.25 per share and no higher than $6.00 per share. Second, upon negotiations and approval of a definite stock purchase agreement, AeroGlobal would provide an additional $30 million, and Cirrus would arrange to convert into equity $10 million in outstanding debt. This transaction would not involve a change of control, as AeroGlobal would only acquire a 38% interest in the Cirrus equity.

On June 14, 2001 at 11:59 p.m., the time when the Side Letter was scheduled to expire, AeroGlobal and Cirrus had not yet reached an agreement after a heated breakdown in negotiations. Aeroglobal and Cirrus nonetheless resumed negotiations on June 15, 2001 and executed the AeroGlobal Letter of Intent (the "AeroGlobal LOI"), which was forwarded to the Cirrus Board. Alan Klapmeier wrote to Dyslin to give notice that Cirrus had received an Acquisition Proposal and that the Cirrus Board would meet to consider it on the following day. After "sleeping on" the AeroGlobal LOI for a night, the Cirrus Board, on June 17, 2001, determined that the AeroGlobal proposal was a "Superior Proposal" within the meaning of the CHCL SPA. Thereafter, the Cirrus Board passed three resolutions: (1) the AeroGlobal LOI was conditionally approved; (2) the CHCL SPA was terminated; and (3) the Cirrus Board withdrew its recommendation to the shareholders that the transaction with Crescent should be accepted.

Before implementing these decisions, the Cirrus Board sent Alan Klapmeier to ask Dyslin for a one-day extension of the Open Window to allow them to engage in further negotiations with Crescent over their deal. After Cirrus received word that the Open Window would not be extended, Alan Klapmeier executed the deal with AeroGlobal. Upon receiving the first $12 million (of the $15 million bridge loan) from AeroGlobal, Cirrus notified Crescent that it was terminating the CHCL SPA pursuant to Section 11.1.7.[4] Cirrus then wired Crescent $4 million of that amount to repay a loan that Crescent had extended. It also purported to tender payment of the $5 million termination fee required under the CHCL SPA. Crescent accepted the $4 million loan repayment but refused to accept the $5 million termination fee.

**J. Crescent's Court of Chancery Action**

On June 27, 2001, in response to the Cirrus Board approving the Aeroglobal LOI and terminating the CHCL SPA, CHCL filed a verified complaint in the Court of Chancery seeking, among other things, injunctive relief. CHCL then filed a motion for a preliminary injunction seeking to enjoin Cirrus and AeroGlobal from taking further steps to complete the AeroGlobal LOI, including the mailing of proxy materials and holding a special meeting of the shareholders. CHCL also filed a motion for a temporary restraining order, which was eventually withdrawn.

**K. The Parties' Conduct in the Interim of the Court of Chancery Action**

By the time the Court of Chancery action was filed, AeroGlobal had provided

---

4. Section 11.1.7 of the CHCL SPA provides for termination of the CHCL SPA by Cirrus provided that Cirrus tenders payment to CHCL for terminating the agreement if Cirrus consummates an Alternative Transaction.

Cirrus with $12 million of the $15 million bridge financing. Aeroglobal decided to defer the remaining $3 million bridge loan payment until after the uncertainties caused by the Court of Chancery action had been resolved.

In the early parts of July 2001, AeroGlobal also proposed an amendment of the AeroGlobal LOI to Cirrus, in which Aero-Global's second stage investment of $30 million would be deferred until after the Court of Chancery issued a decision in favor of Cirrus and expiration of the time to appeal any such decision. The proposal would also allow AeroGlobal to place the remaining $3 million of the bridge loan into an escrow account, pending resolution of the lawsuit in the Court of Chancery. Cirrus rejected both proposals. However, on July 10, 2001, Cirrus agreed to and did amend the AeroGlobal LOI for the sole purpose of including an extension of the closing deadline for the $30 million investment from August 2, 2001 to August 10, 2001.

At the same time it was having difficulties with the AeroGlobal loans, Cirrus began to consider other financing options. Nonetheless, Alan Klapmeier explicitly acknowledged that despite AeroGlobal's deferral of the remaining $3 million bridge loan payment, the exclusive negotiations provision contained in the AeroGlobal LOI remained in full force and prohibited Cirrus from discussing other financing options. On July 13, 2001, CHCL offered to dismiss the Chancery Court litigation against Cirrus in exchange for payment of $10 million. Cirrus rejected the offer but did begin to discuss the possibility of reviving the initial CHCL SPA.

## L. The Court of Chancery's Decision

On July 19, 2001, the Court of Chancery denied CHCL's motion for injunctive relief. Of particular significance in this appeal is a statement in the Court of Chancery's opinion that "the $3 million shortfall is due entirely to the pendency of this [preliminary injunction] motion and a resultant understanding between Cirrus and AeroGlobal that the completion of the funding [of the bridge loan] should be delayed pending its outcome."[5]

## M. Cirrus and Crescent's New Stock Purchase Agreement

Shortly after the Court of Chancery's decision, on July 30, 2001, the Cirrus Board voted unanimously to withdraw approval of the AeroGlobal LOI and instead approved a second stock purchase agreement with Crescent (the "Second CHCL SPA"). This agreement provided for an immediate infusion of $15 million in cash. That action was formally passed by the Cirrus Board on August 7, 2001.

## N. AeroGlobal's Superior Court Action

On August 9, 2001, one day before the AeroGlobal LOI was to expire, AeroGlobal filed the instant action in the Superior Court against the defendants asserting four causes of action, including breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual obligations and civil conspiracy. Aeroglobal subsequently filed a related action in the Superior Court, making substantially the same allegations against FIIB as it had made against the defendants in the instant action.[6] Upon the close of discovery, the defendants moved for summary judgment.

---

5. *Cirrus Holding Company Ltd. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1203 n. 18 (Del.Ch. 2001).

6. *See AeroGlobal Capital Management, LLC v. First Islamic Investment Bank, E.C.*, C.A. No. 01C–11–127 (Del.Super.).

At oral argument on the motion for summary judgment, counsel for AeroGlobal informed the Superior Court that AeroGlobal had received advance information concerning the Cirrus Board adopting the Second CHCL SPA prior to the Cirrus Board terminating the Aeroglobal LOI. AeroGlobal's counsel suggests that this information was the basis for the institution of the instant action. In any event, Cirrus did not formally notify AeroGlobal that it was terminating the AeroGlobal LOI until August 13, 2001, the same day on which Cirrus received payment of the $15 million cash infusion from Crescent under the Second CHCL SPA. At that point, Cirrus repaid the $12 million obtained from the bridge loan, along with interest on the principal and attorneys' fees, to AeroGlobal.

 The Superior Court granted summary judgement in favor of the defendants after it concluded that Cirrus did not breach its contractual obligations or its duty of good faith and fair dealing. Instead, the Superior Court found that it was AeroGlobal that failed to fulfill its contractual obligations by not immediately funding the entire $15 million bridge loan. The Superior Court also held, in the alternative, that the same result was required because AeroGlobal repudiated its deal with Cirrus prior to the consummation of the deal. The Superior Court further held that there was no predicate for AeroGlobal's tortious interference and civil conspiracy claims. It reasoned that the claims of tortious interference with contractual relations [7] and civil conspiracy [8] require the existence of a contractual and/or business relationship which was terminated or interrupted by wrongful conduct by one of the parties involved or a third party acting either separately or in concert. Because the Superior Court found no wrongdoing on the part of the defendants, it determined that there was no valid claim for tortious interference or civil conspiracy against the defendants.

## II. Personal Jurisdiction over FIIB

From the outset of the Superior Court action, FIIB has contested whether it was subject to personal jurisdiction in Delaware. The Superior Court denied FIIB's motion to dismiss for lack of personal jurisdiction, finding that FIIB had availed itself to the laws of this State and was therefore subject to being sued in Delaware. FIIB has cross-appealed this ruling. It maintains that neither the Delaware Long Arm Statute nor the Due Process Clause of the Fourteenth Amendment support the exercise of personal jurisdiction in this case.

 We review a trial court's denial of a motion to dismiss for lack of personal jurisdiction under a *de novo* standard of review.[9] A plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defen-

---

7. The elements of tortious interference under Delaware law are well established. "There must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *See Aspen Advisors LLC v. UA Theater Co.*, 861 A.2d 1251, 1265–66 (Del.2004) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del.Ch.1987)).

8. The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage. *See Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del.1987).

9. *Alston v. Hudson, Jones, Jaywork, Williams and Ligouri*, 748 A.2d 406, 2000 WL 275673, at *1, 2000 Del. Lexis 120, at *2.

dant.[10] In determining whether a plaintiff satisfies this burden, Delaware courts will apply a two-prong analysis to the issue of personal jurisdiction over a nonresident.[11] The court must first consider whether Delaware's Long Arm Statute is applicable, and next evaluate whether subjecting the nonresident to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment (the so-called "minimum contacts" requirement).[12]

## A. Applicability of Delaware's Long Arm Statute

In finding that FIIB was subject to personal jurisdiction in this State, the Superior Court relied on 10 *Del. C.* § 3104(c)(1). This subsection provides:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) *Transacts any business* or performs any character of work or service in the State .... [13]

The Superior Court reasoned that FIIB transacted business in Delaware when, through its agents, CHCL and Crescent, it entered into the two separate stock purchase agreements with Cirrus. These acts ultimately resulted in Cirrus accepting the Second CHCL SPA and terminating the AeroGlobal LOI, which is this basis of the entire lawsuit.

The facts relevant to establish the Superior Court's jurisdiction over FIIB are clear. There is no dispute that CHCL and Crescent were agents of FIIB. Crescent, FIIB's Delaware subsidiary, existed for the sole purpose of securing attractive investment opportunities in the United States on behalf of FIIB. CHCL was formed for the express purpose of facilitating an investment by FIIB in Cirrus. FIIB, through its agents, entered into a stock purchase agreement with Cirrus, a privately held Delaware corporation, to purchase a substantial amount of Cirrus's capital stock. The offers made by Crescent to purchase Cirrus's capital stock, the last of which led to the instant action, were made on behalf of FIIB and involved FIIB funds.[14] Furthermore, the parties expressly agreed that Delaware law governed their agreement.[15] FIIB, through its agents, was also required to approve and adopt and then cause Cirrus to adopt new bylaws[16] and a certificate of incorporation[17] pursuant to Delaware law.

---

10. *Jacobson v. Ronsdorf*, 2005 WL 29881, *3, 2005 Del. Ch. Lexis 2, *9–*10.

11. *LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 769 (Del.1986).

12. *Id.* (citing *Waters v. Deutz Corp.*, 479 A.2d 273 (Del.1984)).

13. DEL. CODE ANN. tit. 10, § 3104(c)(1) (2005) · (emphasis added).

14. A letter from Crescent to Cirrus's Board, dated June 20, 2001, establishes that the offers made by Crescent were on behalf of FIIB and with FIIB's explicit authorization and direction.

15. Section 13.8 of the Second CHCL SPA states that "[t]his Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without reference to Delaware choice of law rules."

16. Section 3.2 of the Second CHCL SPA states that CHCL "shall approve and adopt, and shall cause Cirrus to, adopt, the bylaws in the form attached hereto as *Exhibit 3.2* (the *'Post-transaction Cirrus Bylaws'*), which shall be the bylaws of Cirrus until thereafter changed or amended."

17. Section 3.1 of the Second CHCL SPA states:

> [CHCL] shall approve and adopt, and cause Cirrus to, file with the Secretary of State of the State of Delaware, the certificate of

FIIB argues that these facts are insufficient to constitute transacting business in Delaware. FIIB relies on *Greenly v. Davis*,[18] for the position that its mere negotiations to purchase stock in Cirrus through its agents did not amount to a transaction of business in Delaware, especially where the negotiation and consummation of the transaction did not take place in Delaware. In *Greenly*, this Court found that the trial court correctly concluded that a Pennsylvania resident who allegedly breached a contract to sell a Delaware corporation was not subject to *in personam* jurisdiction in this State.[19] The plaintiff in *Greenly* was interested in purchasing two companies from the defendants who contracted for the sale.[20] In *Greenly*, the defendants were not Delaware residents.[21] The *Greenly* defendants owned a Pennsylvania corporation and a Delaware corporation.[22] Neither defendant had ever transacted business in Delaware related to the focus of the dispute in the lawsuit.[23] The trial court granted a motion to dismiss based upon factual affidavits which established that

the parties negotiated the agreement in Pennsylvania with no actual contact relating to the transaction of sale in Delaware except "a part of the negotiations included a proposed sale of stock of a Delaware corporation which does transact business in Delaware."[24] In affirming the trial court's decision, this Court held that the negotiation of a contract for sale of stock by Pennsylvania residents did not amount to a transaction of business in Delaware, even though part of the negotiations included a proposed sale of a Delaware corporation that transacts business in Delaware.[25]

■■■■■ We acknowledge that the ownership of a Delaware subsidiary does not, without more, amount to the transaction of business under Delaware's Long Arm Statute.[26] However, as is the case here, the ownership of a Delaware subsidiary may constitute the transaction of business under Delaware's Long Arm Statute where the underlying cause of action arises from the creation and operation of the Delaware subsidiary.[27] This is the

incorporation in the form attached hereto as *Exhibit 3.1* (the *"Post–Transaction Cirrus Certificate of Incorporation "*), which shall be the certificate of incorporation until thereafter amended in accordance with Delaware General Corporation Law.

18. 486 A.2d 669 (Del.1984).

19. *Id.* at 671.

20. *Id.*

21. *Id.* at 670.

22. *Greenly*, 486 A.2d at 670.

23. *Id.*

24. *Id.* at 671.

25. *Id.*

26. *See Venoco, Inc. v. Marquez*, 2003 WL 21026787, at *3, 2003 U.S. Dist. Lexis 7593, at *8 (D.Del.) (citing *In re DaimlerChrysler AG*

*Sec. Litig.*, 197 F.Supp.2d 86, 98 (D.Del. 2002); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *Hana Ranch, Inc. v. Lent*, 424 A.2d 28, 31 (Del.Ch. 1980)).

27. *Cf. Papendick v. Bosch*, 410 A.2d 148, 152 (Del.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980) (concluding that stock ownership of a Delaware subsidiary is not by itself a sufficient contact to predicate personal jurisdiction but the formation and operation of a Delaware subsidiary may provide sufficient "minimum contacts" where the cause of action arises from the creation and operation of the Delaware subsidiary); *Sternberg v. O'Neil*, 550 A.2d 1105, 1107 (Del.1988) (holding that a foreign corporation's (qualified *to do business in Delaware*) ownership of a Delaware subsidiary whose alleged mismanagement was the subject of a double derivative suit constituted a "minimum contact" with Delaware sufficient to satisfy the Due Process Clause and enable

case where the foreign corporation created and operated the Delaware subsidiary in a manner that would avail itself of the benefits and protections of the laws of the State of Delaware. In the present case, FIIB created Crescent, its Delaware subsidiary, for the express purpose of facilitating private equity investments in the United States, including Delaware. The acquisition of Cirrus, for example, was the type of transaction contemplated by FIIB when it created and operated Cirrus under the benefits and protections of Delaware law. The totality of the circumstances in this case show that FIIB transacted business in this State within the meaning of Delaware's Long Arm Statute.

Moreover, *Greenly* is distinguishable from the present case before this Court. Here, as compared to *Greenly*, the parties purposely chose Delaware law to govern the stock purchase agreement and the sale of Cirrus's stock to CHCL was more than a mere possibility. The parties in this case expressly intended that CHCL would purchase a substantial amount of Cirrus's capital stock upon the happening of stated events. This is in contrast to *Greenly* where there was only a mere possibility of a stock sale. While evidence of physical presence may be helpful in determining a party's intent to transact business and to show the actual transaction of business in this State, we hold that such evidence is not the *sine qua non* for juris-

diction under Delaware's Long Arm Statute.[28] In this case, the totality of the circumstances show that FIIB engaged in sufficient conduct to constitute transacting business in this State within the meaning of Delaware's Long Arm Statute.

## B. The Minimum Contacts Requirement

We next address whether the imposition of *in personam* jurisdiction in this case under Delaware's Long Arm Statute violates the Due Process Clause of the Fourteenth Amendment. The focus of this inquiry is whether FIIB engaged in sufficient "minimum contacts" with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice.[29] In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should "reasonably anticipate" being required to defend itself in Delaware's courts.[30] Due process issues arising from the imposition of *in personam* jurisdiction involves a purely legal determination. Accordingly, our review on appeal is *de novo*.[31]

We find the teachings from this Court's opinion in *Papendick* instructive. The *Papendick* case was an *in rem* action involving the attachment of a parent-foreign corporation's stock interest in a wholly owned

Delaware courts to exercise specific personal jurisdiction over the foreign corporation).

28. *NRG Barriers, Inc. v. Jelin*, 1996 WL 377014, 1996 Del. Ch. Lexis 81. (distinguishing the *Greenly* case and criticizing the defendants' use of an analytical approach based upon facts denoting physical presence for determining whether the transaction of business occurred in Delaware).

29. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

30. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

31. *Hercules, Inc. v. Leu Trust & Banking, Ltd.*, 611 A.2d 476, 480–81 (Del.1992) (citing *Chao v. State*, 604 A.2d 1351, 1360 n. 7 (Del.1992); *Gannett Co., Inc. v. State*, 571 A.2d 735, 739 (Del.1989)).

Delaware subsidiary.[32] In *Papendick*, the litigation involved an alleged breach of contract.[33] The parent-foreign corporation had formed a Delaware subsidiary for the purpose of executing the contract which was allegedly breached.[34] This Court concluded that the foreign corporation, which had formed a Delaware subsidiary for the purpose of implementing a contract, had implicitly consented to the jurisdiction of Delaware's courts in an action brought against both the foreign corporation and its Delaware subsidiary for allegedly breaching the contract at issue.[35] In doing so, this Court followed the mandate of the United States Supreme court in *Shaffer*,[36] which instructed courts to focus upon the relationship between the defendant, the forum and the litigation when addressing the minimum contacts requirement.[37]

A later decision by this Court explaining *Papendick* provided that "[t]he decision of the foreign-parent corporation to maintain a direct and continuing connection between Delaware and itself, as the owner of a Delaware subsidiary, was found to be a 'minimum contact' of paramount importance in the specific jurisdictional analysis of *Papendick*...."[38] We find particularly relevant the following language in *Papendick*:

> We do not believe that the *International Shoe* "minimum contact" due process standards were intended to deprive Delaware courts of jurisdiction by permitting an alien corporation to come into this State to create a Delaware corporate subsidiary for the purpose of implementing a contract under the protection of and pursuant to powers granted by the laws of Delaware, and then be heard to say, in a suit arising from the very contract which the subsidiary was created to implement, that the only contact between it and Delaware is the "mere" ownership of stock of the subsidiary.

The latter point is most significant in applying *International Shoe* standards. There is a controlling distinction, for present purposes, between the ownership of shares of stock acquired by purchase or grant as in *Shaffer*, on the one hand, and ownership arising from the purposeful utilization of the benefits and protections of the Delaware Corporation Law in activities related to the underlying cause of action, on the other hand. [Here, the appellee] purposefully availed itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action. Therein lies the "minimum contact" sufficient to sustain the jurisdiction of Delaware's courts over [the appellee].[39]

The United States Supreme Court has provided further guidance for determination of whether the defendant has established "minimum contacts" in the forum State which would support the exercise of *in personam* jurisdiction.[40] In *Burger King Corp.*, the United States Supreme Court held that "the constitutional touchstone remains whether the defendant pur-

---

32. *Papendick*, 410 A.2d at 149.

33. *Id.* at 148.

34. *Id.* at 149–50.

35. *Id.* at 152.

36. *Shaffer*, 433 U.S. at 204, 97 S.Ct. 2569.

37. *Papendick*, 410 A.2d at 152.

38. *See Sternberg*, 550 A.2d at 1120 (explaining this Court's decision in *Papendick*).

39. *Papendick*, 410 A.2d at 152.

40. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

posefully established 'minimum contacts' in the forum State." [41] This Court has recognized that "the minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created continuing obligations between himself (itself) and the forum." [42] In *Burger King Corp.*, the United States Supreme Court further explained:

> [W]here the defendant "deliberately" has engaged in significant activities within a State, ... or has created "continuing obligations" between himself and residents of the forum, ... [the defendant] manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.[43]

In this case, the totality of the circumstances show that FIIB had sufficient ties to this State to satisfy the minimum contacts requirement. FIIB, through its agents, executed two stock purchase agreements with a privately held Delaware corporation. It negotiated the stock purchase agreements through Crescent, its Delaware subsidiary which advises it on various private equity investments located in the United States. The stock purchase agreement also calls for Delaware law to govern disputes arising from it. It is reasonable to infer that FIIB benefited from Delaware law by operating Crescent for commercial gain, including the benefits afforded by equity investments secured by Crescent.

■■■ Having found that FIIB purposefully established minimum contacts with this State, these contacts must be considered in light of other factors to determine whether the imposition of personal jurisdiction would comport with fair play and substantial justice principles.[44] However, the United States Supreme Court has noted that "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." [45] When a corporate defendant who has purposefully directed its activities at the forum State seeks to defeat jurisdiction, it "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." [46]

FIIB has not presented any compelling evidence suggesting that the exercise of personal jurisdiction in the present case would be unreasonable. FIIB has simply argued that its purchase of a Delaware corporation cannot be a sufficient contact with the State to satisfy the Due Process Clause. We have previously rejected this argument because the facts here involve more than that single circumstance. Furthermore, Delaware has a legitimate interest in resolving AeroGlobal's claims. FIIB used the benefits and protections of Delaware law to maintain its corporate subsidiary. As a result, Delaware has a legitimate interest in holding accountable those

---

**41.** *Id.* at 474, 105 S.Ct. 2174 (citing *International Shoe Co.*, 326 U.S. at 316, 66 S.Ct. 154).

**42.** *Sternberg,* 550 A.2d at 1120.

**43.** *Burger King Corp.*, 471 U.S. at 475–76, 105 S.Ct. 2174.

**44.** *Sternberg,* 550 A.2d at 1122 (citing *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174).

**45.** *Burger King Corp.*, 471 U.S. at 474, 105 S.Ct. 2174.

**46.** *Sternberg,* 550 A.2d at 1122 (quoting *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174).

responsible for operating a Delaware subsidiary corporation in such a fashion.[47] Under the totality of the circumstances in this case, the Superior Court correctly concluded that the motion to dismiss for lack of personal jurisdiction should be denied.

### III. The Superior Court's Grant of Summary Judgment

We now turn to AeroGlobal's direct appeal. AeroGlobal first argues that the Superior Court erred in granting summary judgment because a genuine issue of material fact existed as to whether: (1) Cirrus waived strict compliance for immediate payment of the entire $15 million bridge loan upon execution of the AeroGlobal LOI; (2) Cirrus was estopped by its conduct in the Court of Chancery action from asserting in this case that it did not waive its aforementioned contractual right; and (3) AeroGlobal materially breached the AeroGlobal LOI thereby rendering Cirrus' termination thereof unjustified. AeroGlobal further contends that the Superior Court erred in determining that it repudiated the AeroGlobal LOI. AeroGlobal finally challenges the Superior Court's dismissal of its claim asserting a breach of the implied covenant of good faith and fair dealing.

We discuss only the waiver issue raised by AeroGlobal because it is dispositive of the appeal. In doing so, we conclude that the Superior Court erred, as a matter of law, by granting summary judgment in favor of the defendants because there was a triable issue of fact as to whether Cirrus waived compliance with the contract terms for the immediate payment of the entire $15 million bridge loan upon execution of the AeroGlobal LOI. We therefore reverse the Superior Court's grant of summary judgment as to AeroGlobal's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. We further hold that the Superior Court prematurely determined that the defendants had not wrongfully interfered with or terminated the AeroGlobal LOI. We therefore reverse the Superior Court's grant of summary judgment as to AeroGlobal's tortious interference and civil conspiracy claims.

### A. Standard of Review on Summary Judgment on a Waiver Claim

The purpose of Superior Court Civil Rule 56 is to provide a method by which issues of law involved in a litigation may be speedily brought before a trial court and disposed of without unnecessary delay.[48] "The disposition of litigation by motion for summary judgment should, when possible, be encouraged for it should result in a prompt, expeditious and economical ending of lawsuits." [49]

Although summary judgment is encouraged when possible, there is no absolute right to summary judgment.[50] Summary judgment should be granted only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." [51] A trial court's decision on a motion for summary judgment is subject to a *de novo* standard of review on appeal.[52]

**47.** *Id.* at 1124.

**48.** *State ex rel. Mitchell v. Wolcott*, 83 A.2d 759, 760 (Del.1951).

**49.** *Davis v. University of Delaware*, 240 A.2d 583, 584 (Del.1968).

**50.** *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969).

**51.** Del. Super. Ct. Civ. R. 56(c).

**52.** *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del.2002) (citing *Stroud v. Grace*, 606 A.2d 75, 81 (Del.1992)).

In evaluating the summary judgment record, a trial court shall not weigh the evidence or resolve conflicts presented by pretrial discovery.[53] The trial court shall examine the factual record and make reasonable inferences therefrom in the light most favorable to the nonmoving party to determine if there is any dispute of material fact.[54] "The trier of fact may weigh the evidence and resolve disputes only after hearing all the evidence, including live witness testimony."[55] Thus, if from the evidence produced there is a reasonable indication that a material fact is in dispute or if it appears desirable to inquire more thoroughly into the facts in order to clarify application of the law, summary judgment is not appropriate.[56] "This is an axiom of the judicial process and applies unless the parties have stipulated that the paper record shall constitute the trial record."[57] We consider it an exercise of "good judicial administration [for a trial court] to withhold decision ... until [the record] present[s] a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts."[58]

## B. Criteria for Waiver of Contractual Requirements or Conditions

It is well settled in Delaware that contractual requirements or conditions may be waived.[59] However, the standards for proving waiver under Delaware law are "quite exacting."[60] "Waiver is the voluntary and intentional relinquishment of a known right."[61] It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights.[62] The facts relied upon to prove waiver must be unequivocal.[63]

Based on these fundamental principles, we reiterate the three elements which must be satisfied before a conclusion of waiver may be reached. A contractual requirement or condition may be waived where (1) there is a requirement or condition to be waived, (2) the waiving party must know of the requirement or condition, and (3) the waiving party must intend to waive that requirement or condition.[64]

53. *Id.* (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1149–50 (Del. 2002)).

54. *Motorola, Inc. v. Amkor Tech., Inc.,* 849 A.2d 931, 935 (Del.2004) (citing *Rhudy v. Bottlecaps, Inc.,* 830 A.2d 402, 405 (Del. 2003)).

55. *Telxon Corp.,* 802 A.2d at 262 (citing *Cerberus,* 794 A.2d at 1150).

56. *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962), *modified,* 208 A.2d 495 (Del.1965); *Myers v. Nicholson,* 192 A.2d 448, 451 (Del.Super.1963).

57. *See Cerberus,* 794 A.2d at 1149. *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (providing that trial courts should act "with caution" when granting summary judgment).

58. *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

59. *Pepsi–Cola Bottling Co. v. Pepsico, Inc.,* 297 A.2d 28, 33 (Del.1972).

60. *American Family Mortgage Corp. v. Acierno,* 1994 WL 144591, at *5, 640 A.2d 655, 1994 Del. Lexis 105, at *13.

61. *Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450, 456 (Del.1982) (citing 28 Am.Jur.2d, *Estoppel and Waiver,* § 158 (1966); *George v. Frank A. Robino, Inc.,* 334 A.2d 223, 224 (Del.1975)).

62. *Id.* (citing *Klein v. American Luggage Works, Inc.,* 158 A.2d 814, 818 (Del.1960); *Moore v. Travelers Indemnity Ins. Co.,* 408 A.2d 298, 301 (Del.Super.1979)).

63. *Id.* (citing 28 Am.Jur.2d, *Estoppel and Waiver,* § 163 (1966)).

64. *Pepsi–Cola Bottling Co.,* 297 A.2d at 33.

Although we have held that this standard is "quite exacting," we nonetheless find that summary judgment was inappropriate in the present case as to AeroGlobal's claim of waiver.

## C. Waiver of the "Timing Requirement" for the Immediate Payment of the Entire AeroGlobal Bridge Loan

■ At the heart of AeroGlobal's case is its claim that the defendants breached Section 4.d of the AeroGlobal LOI (the "Exclusive Negotiations Provision") by negotiating the Cirrus–Crescent stock acquisition while at the same time Cirrus purported to honor the AeroGlobal LOI.[65] Cirrus responded that it was not required to comply with the Exclusive Negotiations Provision because AeroGlobal breached Section 1.a of the AeroGlobal LOI (the "Timing Requirement") by failing to immediately pay the full $15 million bridge loan.[66] In essence, Cirrus is claiming that the Timing Requirement was an exception to the applicability of the Exclusive Negotiations Provision. The Superior Court agreed, and granted summary judgment in favor of the defendants. It held that the Exclusive Negotiations Provision was not binding on the parties because AeroGlobal failed to fulfill its obligations under the AeroGlobal LOI by withholding the

remaining $3 million installment on the bridge loan. The Superior Court concluded that Cirrus was therefore free to negotiate for the needed financing with any party it deemed appropriate.

■ Intention forms the foundation of the doctrine of waiver, and an intention to waive must appear clear from the record evidence before summary judgment is granted on this issue.[67] The dispute in this case centers on whether Cirrus intended to waive the Timing Requirement. The question of Cirrus's intent in the instant case depends on a consideration of the facts surrounding Cirrus and AeroGlobal's dealings after CHCL initiated the Court of Chancery action.

The record shows that Cirrus accepted the $12 million portion of the bridge loan for its benefit without demanding payment of the remaining $3 million. Cirrus promptly used that amount to repay a $4 million loan that Crescent had extended. Cirrus also attempted to use this amount to pay the $5 million break up fee under the CHCL SPA, but this payment was refused by Crescent. Cirrus used the remaining funds as working capital.

In deciding CHCL's action seeking injunctive relief, the Court of Chancery found that AeroGlobal's deferral of the

65. Section 4.d of the AeroGlobal LOI states: As long as [AeroGlobal] meets its obligations under the terms of this [LOI], Cirrus, for itself and its officers, directors, shareholders and employees, agrees not to enter into any agreements or hold any discussions, directly or indirectly through any affiliate, with any other person or firm concerning the sale or other disposition of its stock or assets or any material investment until the later of the Investment Date and the expiration or termination of the Definitive Agreements (the "Expiration Date"). For purposes of the first sentence of this Section 4d, except as relates to Section 1a, [AeroGlobal] shall not be deemed to have failed to have met its obligations under this

[LOI] until fifteen (15) days after Cirrus shall have given notice to [AeroGlobal] of each alleged failure to meet such obligations, specifying such alleged failure in reasonable detail to allow [AeroGlobal] to cure it, if such alleged failure remains uncured after the 15 day period.

66. Section 1.a of the AeroGlobal LOI provides that "[u]pon signing [the AeroGlobal LOI], [AeroGlobal] irrevocably commits to provide Cirrus a bridge loan [of] $15,000,000 and [AeroGlobal] will immediately advance to Cirrus $15,000,000."

67. *George,* 334 A.2d at 224.

remaining $3 million bridge loan payment was "due entirely to the pendency of this [preliminary injunction] motion and a resultant understanding between Cirrus and AeroGlobal that the completion of the funding [of the bridge loan] should be delayed pending its outcome."[68] The Court of Chancery made this finding on a record similar to what was before the Superior Court in this case.

The record also shows that Alan Klapmeier explicitly acknowledged that the agreement with AeroGlobal remained in full force and effect. When Cirrus began to consider other financing options after AeroGlobal deferred payment of the remaining $3 million of the bridge loan, Alan Klapmeier told the Cirrus board that the Exclusive Negotiations Provision remained in effect and prohibited such conduct regardless of AeroGlobal's deferral.

We conclude that it was for the trier of fact to decide whether Cirrus's conduct under the circumstances of this case evidenced an intentional, conscious and voluntary abandonment of its claim or right.[69] Where the inference or ultimate fact to be established concerns intent or other subjective reaction, summary judgment is ordinarily inappropriate.[70] On the record before us we hold that a waiver was a permissible inference that could reasonably be drawn from the evidence. It was error to grant summary judgment in the face of this material dispute of fact.

## IV. Conclusion

Accordingly, we affirm the judgment of the Superior Court denying FIIB's motion to dismiss for lack of personal jurisdiction.

We reverse the judgment of the Superior Court granting summary judgment to the defendants and remand this matter for further proceedings consistent with this opinion.

---

**68.** *Cirrus Holding Company Ltd.,* 794 A.2d at 1203 n. 18.

**69.** *George,* 334 A.2d at 224 (citing *Nathan Miller, Inc. v. Northern Ins. Co. of New York,* 39 A.2d 23 (Del.Super.1944)).

**70.** *Id.* (citing 6 James Wm Moore Et. Al., Moore's Federal Practice § 56.17 (2nd ed.); *Continental Oil Co. v. Pauley Petroleum, Inc.,* 251 A.2d 824 (Del.1969)).